# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59511-7-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| LARRY GLEN McALPINE, | |
| Appellant. | |

CHE, J. — Larry Glen McAlpine appeals his conviction for first degree child molestation and his sentence of life without the possibility of parole, imposed pursuant to the Persistent Offender Accountability Act (POAA).

McAlpine argues that the prosecutor committed misconduct in closing by (1) repeatedly telling the jury that ten-year-olds do not make up sexual assaults, (2) offering an opinion on McAlpine's guilt, and (3) repeatedly denigrating defense counsel and their argument by referring to defense's theory as "ridiculous."[1]  McAlpine also argues that the trial court violated his state and federal constitutional rights to a jury trial and erred in its determination that McAlpine's out-of-state conviction was factually comparable to a Washington offense and that the conviction qualified as a strike under the POAA.  Finally, in a statement of additional grounds (SAG),

---

[1] Br. of Appellant at 18.

McAlpine claims that prosecutorial misconduct occurred during voir dire by the prosecutor's repeated questioning of a prospective juror who was ultimately excused.

We hold that McAlpine fails to establish a prosecutorial misconduct claim based on the prosecutor's statements because (1) the prosecutor's comments that ten-year-olds do not make up sexual assaults were not improper under these circumstances, (2) McAlpine fails to show that the prosecutor's comment about McAlpine's guilt was incurable, (3) the prosecutor's use of the term "ridiculous" did not amount to impugning defense counsel or their arguments, and (4) McAlpine fails to establish that the prosecutor's questioning of the unseated prospective juror could not have been cured. Additionally, we hold that McAlpine fails to show that the trial court's POAA analysis violated his right to a jury trial or that the trial court erred in finding his out-of-state conviction factually comparable to a strike-eligible POAA offense in Washington. Accordingly, we affirm McAlpine's judgment and sentence.

FACTS

*Background*

In August 2019, when LL was ten years old, she and her family lived across the street from McAlpine. While LL played a game involving creating imaginary characters and situations called "Creepypasta" with two of her friends, she told them that McAlpine inappropriately touched her two days prior. 2 Rep. of Proc. (RP) (Jan. 31, 2024) at 518. That same day, LL disclosed the incident to another friend and then to her mom. LL's mom called the police and, when the responding officer interviewed LL, LL told the officer that she thought the incident was a daydream and McAlpine had been a figment of her imagination. LL had told her friends and mom the same thing.

Based on LL's allegations, the responding officer referred the case to Detective Muller. Detective Muller talked with LL's mom and had LL undergo a forensic interview with a child specialist forensic interviewer. Eventually, Detective Muller executed a search warrant on McAlpine's home, interviewed McAlpine, and arrested him. The State charged McAlpine with first degree child molestation.[2]

*Trial*

A.      *Voir Dire*

During voir dire, the following interactions occurred between the prosecutor and prospective juror 42 who was a deputy prosecutor in another county. After a different prospective juror stated, "kids like attention, and they'll say whatever they want to get attention," the prosecutor asked if anyone disagreed with that statement. 1 RP (Jan. 30, 2024) at 286. When prospective juror 42 raised their hand, the prosecutor requested they explain why they disagreed. The prospective juror stated, "I think it's just too much of a generalization. I think every kid is different, and I think it would be exceptional to tell a lie, especially a really serious lie, just to get attention." 1 RP (Jan. 30, 2024) at 286. At the prosecutor's request to elaborate more, the prospective juror continued:

> Well, I think, for the most part—I'm not that cynical about kids—so I don't think that they necessarily lie. Everybody, I guess, is capable of lying, but as far as, you know, like saying somebody robbed a bank or whatever you want to do, to falsely accuse someone of something serious just to get attention, I don't really see that happening. I don't see that not unraveling, because it's—a child just can't sustain that kind of lie.

---

[2] The State also charged McAlpine with five counts first degree possession of depictions of a minor engaged in sexually explicit conduct and one count of second degree possession of depictions of a minor engaged in sexually explicit conduct. Those counts were severed from the case before trial and then dismissed following a State motion from the State before sentencing in this case.

1 RP (Jan. 30, 2024) at 286-87.  The prosecutor responded by asking the prospective juror what they meant by saying "a child cannot sustain that kind of lie."  1 RP (Jan. 30, 2024) at 287.  The prospective juror explained that "in time, the story falls apart. They can't track the details.  They contradict themselves.  They give up and just tell the truth or …[t]hey could not sustain that type of lie over time…of a serious allegation."  1 RP (Jan. 30, 2024) at 287.

Later, the prosecutor asked the jury pool whether always having DNA evidence, as is depicted in television shows, is realistic.  RP (Jan. 30, 2024) at 320.  The prosecutor selected prospective juror 42 to answer "since you're a prosecutor."  RP (Jan. 30, 2024) at 320.  The following exchange occurred:

> PROSPECTIVE JUROR 42: I don't think that's realistic. I've never seen [a crime investigation television show]*,* but I'm aware of what it is, and always there's, you know, this evidence that makes the case, that, you know, there's forensics, like there's a miracle, like you could do miracle forensic investigations. And a lot of cases, it's not like that at all. It's just someone's testimony might be evidence.
>
> [PROSECUTOR]: Okay. You mentioned testimony might be the evidence. Can you elaborate on that a little bit? What do you mean by that?
>
> PROSPECTIVE JUROR 42: I don't want to go too far, because we haven't been instructed on it yet. I don't know that we even all agree on the definition of molestation.
>
> But you can have a situation, there is no evidence except that the person, the victim of the crime accusing the perpetrator of the crime in some cases. It's totally based on just what someone says, and you would have to assess whether that's believable.
>
> [PROSECUTOR]: Okay. Thank you, Juror Number 42.
>
> Was everyone able to hear what juror number 42 said? Does everyone here agree that when it comes to certain crimes that sometimes occur in the privacy of someone's home, that possibly the only evidence is testimony from the witness stand?

Raise your hand if you agree with that. Raise your hand if you think you will always need more than just testimony, that you need physical evidence like DNA with a case like this or with—or with a crime like this.

RP (Jan. 30, 2024) at 320-21.

McAlpine did not object to either of these interactions, but McAlpine used a peremptory challenge to excuse prospective juror 42.  2 RP (Jan. 31, 2024) at 408.

B.      *Trial Testimony*

LL, her mom, the responding law enforcement officer, Detective Mullen, and the child specialist forensic interviewer testified consistently with the facts presented above.

LL also testified that, during the time of the alleged incident, LL would help McAlpine with jobs like washing rocks in an alleyway by McAlpine's apartment or picking up pinecones in his yard for money more than once a week.  Sometimes LL would go do jobs for McAlpine with a friend from the neighborhood.  One weekend in August 2019 when LL's friend was away, LL went over to McAlpine's to see if he had any jobs she could do.  McAlpine told her he had some jobs but could not pay her for a few days.  LL proceeded to wash rocks for McAlpine.

LL testified that she washed the rocks on a stool in front of McAlpine's garage.  LL had two buckets, one filled with the rocks and another filled with soapy water.  At some point, LL began playing with the bubbles in the soapy water, putting them in her hair, dancing around, and "acting like a monster."  2 RP (Jan. 31, 2024) at 507.  McAlpine offered LL a popsicle so LL followed McAlpine through his garage and into the kitchen.  It was the first time LL had ever been in McAlpine's house.

McAlpine then gave LL a mango popsicle in the kitchen.  LL stated that as she ate the popsicle, McAlpine took pictures of her with a camera after McAlpine sought her permission.

5

After McAlpine took the photos, LL went back outside and continued washing the rocks and playing with the bubbles.

LL testified that, after some time back outside, McAlpine asked LL to come into the garage. McAlpine retrieved the camera from inside and then asked LL to pull her shirt, which had one- to two-inch sleeves on it, over her head. When LL just stood there because she did not know what to do, McAlpine pulled her shirt over her head and over her arms to above her elbows. McAlpine told her to "hold it there" and then put bubbles on the strapless, pink bra LL wore. 2 RP (Jan. 31, 2024) at 511. He took a few photographs and then removed the bubbles, pulled down her bra to about her waist, put more bubbles on her breasts—mostly over her nipples—and then took more photographs. As McAlpine put the bubbles on her breasts, he touched her nipples and breasts.

LL testified that she did not remember how many photographs McAlpine had taken of her with the bra on, but LL knew McAlpine had taken photographs because she saw the camera flash and heard the camera click. LL remembered McAlpine taking four to five photographs of her once he removed her bra.

LL stated that, once McAlpine took the photographs, he wiped the bubbles off her with his hands, pulled up her bra, and said she could pull her shirt down but "don't tell anyone or else [I]'ll get in trouble." 2 RP (Jan. 31, 2024) at 514. LL went back to washing rocks for a few minutes before she told McAlpine she was done and wanted to go home.

LL testified that, when her neighborhood friend returned, she went back to McAlpine's house with her friend because her friend wanted to see if McAlpine had any jobs for money and

LL did not want her friend to be alone. They did not end up doing any work for McAlpine that day though.

LL disclosed the incident with McAlpine to her friends when her friends wanted LL to participate in a game of "Creepypasta," but LL was quiet and did not want to play. 2 RP (Jan. 31, 2024) at 536. When she eventually told them about the incident, LL admitted that she also told them, "I might have daydreamed about [McAlpine]" and that she thought the incident was a figment of her imagination. 2 RP (Jan. 31, 2024) at 536. She told another friend and her mom that she may have daydreamed the incident when she made her disclosures to them.

Detective Muller testified that, while they searched McAlpine's home for photos of LL, they never found any. Detective Muller stated that they did find popsicles in a chest freezer in McAlpine's kitchen.[3]

C.      *Jury Instructions and Closing Arguments*

The trial court instructed the jury that they must decide the case based solely on the evidence presented and admitted. It continued with instructing the jury that any statements and arguments by the lawyers are not evidence and that the jury must disregard any remark, statement, or argument unsupported by the evidence or the law. The trial court also instructed the jury that they were the sole judges of the witness' credibility and that, in considering witness testimony, they may consider "any . . . factors that affect your evaluation or belief of a witness or your evaluation of his or her testimony." 2 RP (Feb. 6, 2024) at 747.

---

[3] Through Detective Muller's testimony, an audio recording of her interview with McAlpine was admitted into evidence and then played in open court to the jury. The audio recording is not part of the record on appeal, but apparently, McAlpine told Detective Mullen during the recorded interaction that McAlpine's wife liked mango-flavored popsicles. *See* 2 RP (Feb. 5, 2024) at 782.

During closing arguments, the prosecutor argued:

I submit to you, when you go back and you deliberate and you consider all of the evidence in its totality, that the State has proved its case beyond a reasonable doubt. I submit to you [LL] has no reasons to lie. At the time of the incident, she was ten years old.

I submit to you that the fact she was able to give you specific details about what happened, not just Mr. McAlpine touched her inappropriately and that was it, but she was able to tell you where it occurred, what she was doing before it occurred, and how her shirt was pulled up and the fact that her bra was pulled down, the fact that she remembers she was wearing a strapless bra, the fact that she remembers the color of her bra, the fact that she remembers what Mr. McAlpine was wearing that day. She remembered all of that. She was also able to demonstrate for [the child specialist forensic interviewer] how her shirt came up.

And finally, again, she was ten years old at the time. No ten-year-old, I submit to you, is going to make up those set of facts unless it happened to them. Because I submit to you, no ten-year-old goes around thinking to themselves, "I am going to go around and say an adult that I barely know decided to pull my shirt up, put soap bubbles on my bra, take pictures of me, then pull my hot pink bra down, put soap bubbles on my breasts and my nipples and take more pictures of me and then wipe the bubbles down from my chest." No ten-year-old is going to think about those things.

2 RP (Feb. 6, 2024) at 783-84.

In closing argument, McAlpine raised several arguments including that the following evidence created reasonable doubt that the incident ever occurred or indicated that LL's allegations were inconsistent, impossible, or part of a daydreams or a figment of her imagination as part of the "Creepypasta" game: LL's testimony that she disclosed the incident to the other girls while playing the game, inconsistent statements LL made about the sleeves of the shirt she wore during the incident, inconsistent testimony LL gave about how many camera flashes she saw, and LL's testimony that she went back the next day to seek work at McAlpine's house. 2 RP (Feb. 6, 2024) at 788.

On rebuttal, the prosecutor addressed defense's argument that, because LL disclosed the incident during the "Creepypasta game" and LL did not want to play the game, she made up the incident with McAlpine. 2 RP (Feb. 6, 2024) at 814. The prosecutor stated:

> I submit to you, ladies and gentlemen of the jury, that is ridiculous. Because what do ten-year-olds do? What do children do? They play games. . . . And sometimes when they play a game, they make up characters. . . .
> But I submit to you, what are [ten-year-olds] not going to make up? There're not going to make up what happened in this case. Because, again, I submit to you, ladies and gentlemen of the jury, ten-year-olds do not go around thinking about the facts of this case. They have no reason to.
> . . . .
> And why did she say that happened? I submit to you because it actually happened to her in real life. Ten-year-olds, again, do not think of these things, and they do not make up these facts.

2 RP (Feb. 6, 2024) at 814-15.

Then, in responding to defense's argument about LL not being able to describe how the sleeves of her shirt were holding her arms together, therefore indicating that LL made up the incident, the prosecutor stated, "that is ridiculous." 2 RP (Feb. 6, 2024) at 825.

Responding to defense's argument about LL not knowing how many flashes of a camera she saw, the prosecutor stated, "who cares how many flashes she saw? Who is going to remember a minute detail like that, the number of flashes?" 2 RP (Feb. 6, 2024) at 827. The prosecutor then described attending a special occasion, like a wedding, and argued that, because one does not remember exactly how many camera flashes occurred, that the wedding did not happen. The prosecutor stated, "I submit to you that is ridiculous, because no one is going to remember something that specific like the number of flashes." 2 RP (Feb. 6, 2024) at 828.

And, addressing defense's argument about LL going back to McAlpine's house after the incident with her friend, the prosecutor responded, "Just because she went back the next day

doesn't mean this didn't happen. And to think otherwise is ridiculous, because, again, she is ten. No ten-year-old knows what they're supposed to do after they're just sexually abused." 2 RP (Feb. 6, 2024) at 829-30.

The prosecutor discussed certain inconsistent statements McAlpine made while being interviewed by Detective Muller, such as how McAlpine first indicated he had a rule that the neighborhood children were not allowed inside his home and LL had never been in his home. But, when Detective Muller confronted McAlpine with the fact that LL described McAlpine's chest-style freezer in his kitchen from which he gave her a popsicle and police discovered a chest-style freezer in his kitchen with popsicles, McAlpine stated, "I guess maybe [the children] went into my house at some point." 2 RP (Feb. 6, 2024) at 832. The prosecutor also mentioned that McAlpine had also told the detective that he had never given LL a popsicle but stated that his wife liked mango popsicles. When Detective Muller told McAlpine that LL had specifically mentioned McAlpine giving her a mango popsicle, McAlpine admitted, "Oh, well, maybe I guess I gave [LL] a Popsicle." 2 RP (Feb. 6, 2024) at 832. Thereafter, the prosecutor argued:

> If you didn't do what Mr. McAlpine did, a reasonable person in that situation would stick to the same response, because they know what happened and they know what didn't happen. But what was Mr. McAlpine doing? He knew he was getting questioned.
> He knew he was getting caught, and so first, he wants to distance himself from [LL] as far as possible, and then when confronted with specific facts, when he realized, oh, gosh, I'm going to get caught on that fact, well, then I need to come up with an explanation. I submit to you only a guilty person would do that in that situation.

2 RP (Feb. 6, 2024) at 833.

Finally, toward the conclusion of rebuttal, the prosecutor stated:

> Because the State has the burden to prove the case beyond a reasonable doubt, and we welcome that burden in this case. We welcome that burden, because

> I submit to you the State has proved this case beyond a reasonable doubt. Because if you look at the totality of everything and that a ten-year-old doesn't make this up, there was, in fact, a mango Popsicle.

2 RP (Feb. 6, 2024) at 836-37.

When the prosecutor made all of these closing arguments, McAlpine did not object. However, after closing arguments, McAlpine objected to the prosecutor "repeatedly characteriz[ing] myself and my arguments as ridiculous." 2 RP (Feb. 6, 2024) at 839. McAlpine moved to dismiss the case "because I don't think that there is a curative manner available to the court that would remedy the prejudice that resulted in the improper argument." 2 RP (Feb. 6, 2024) at 841-42. The trial court denied McAlpine's motion.

The jury found McAlpine guilty as charged.

*Sentencing*

At sentencing, the State argued that McAlpine was a persistent offender under the POAA, RCW 9.94A.570,[4] because he had a 1997 Oregon conviction for first degree sodomy. The State conceded that the Oregon conviction was not legally comparable to the Washington crime of first degree child rape but argued that it was factually comparable.

The State produced several documents in support of its argument. The State produced a copy of a Clackamas County, Oregon indictment alleging, among other things, that McAlpine "unlawfully and knowingly engage[d] in deviate sexual intercourse with [JM], a child under the age of twelve years." Clerk's Papers (CP) at 104. The State also produced a copy of a petition to enter a guilty plea for first degree sodomy that was signed by McAlpine. The petition stated

---

[4] "Notwithstanding the statutory maximum sentence or any other provision of [chapter 9.94A RCW], a persistent offender shall be sentenced to a term of total confinement for life without the possibility of release." RCW 9.94A.570.

11

that McAlpine was 48 years of age and that "[o]n or between October 1, 1993 and Jan[uary] 31, 1994, in Clackamas County, [McApline] knowingly engaged in deviate sexual intercourse with a child under [the] age [of] 12." CP at 118. A transcript indicates that the petition to enter a guilty plea was accepted and McAlpine's guilty plea entered into the record. None of these produced documents mentioned McAlpine being married nor JM being his stepdaughter.

However, other documents produced by the State mentioned such facts. The State produced an affidavit in support of a motion for a bench warrant and order to show cause filed in the Oregon case before a judgment and sentence was entered. In the affidavit, a police officer described a named individual telling him that McAlpine approached him about purchasing a handgun and "told him that Mr. McAlpine wife's ex-husband . . . had 'set him up' and that he was going to 'take him out.'" CP at 120-21. According to the affidavit, JM was the biological daughter of McAlpine's wife and her ex-husband.

The State also produced a copy of the judgment and sentence, dated May 1997, where the trial court indicated that it imposed a "durational departure" on the sentence for two "substantial and compelling reasons": "violation of trust, stepdaughter" and "violation of release agreement, attempt to purchase of weapon." CP at 125. The State produced a presentence investigation report, ordered by the Oregon trial court after it entered McAlpine's guilty plea which indicated that McAlpine was married and that JM was his stepdaughter. Finally, the State produced an affidavit made by McAlpine of his indigence and request for court-appointed counsel dated June 1997. In the affidavit, McAlpine listed JM as his stepdaughter and noted that he was married to another person, LMM. The affidavit is signed by McAlpine and indicates that he subscribed and swore to its truthful contents before a public notary and under the penalty of perjury.

The trial court found that the Oregon conviction was factually comparable to the Washington crime of first degree child rape. The trial court found that this prior offense made McAlpine a persistent offender and, accordingly, sentenced McAlpine to a sentence of life without the possibility of parole.

McAlpine appeals.

## ANALYSIS

### I. PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT

McAlpine argues that the prosecutor committed reversible misconduct during closing arguments through making certain statements. We disagree.

To prevail on a claim of prosecutorial misconduct, "'the defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial.'" *State v. Gouley*, 19 Wn. App. 2d 185, 200, 494 P.3d 458 (2021) (quoting *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012)); *see also State v. Mak*, 105 Wn.2d 692, 726, 718 P.2d 407. We consider the challenged conduct "'in the context of the whole argument, the issues of the case, the evidence addressed in argument, and the instructions given to the jury.'" *Gouley*, 19 Wn. App. 2d at 200 (quoting *State v. Scherf*, 192 Wn.2d 350, 394, 429 P.3d 776 (2018)).

We employ one of two tests to determine whether reversal is required due to prosecutorial misconduct. *Id*. If the defendant objected to the prosecutor's remarks, the defendant must show that (1) the remarks were improper, and (2) there is a substantial likelihood the misconduct affected the verdict. *Id*. If the defendant did not object below, the defendant waives the prosecutorial misconduct claim unless they can show "(1) that comments were improper, (2) that the prosecutor's comments were both flagrant and ill-intentioned, (3) that the

effect of the improper comments could not have been obviated by a curative instruction, and (4) a substantial likelihood the misconduct affected the verdict." *Id.* at 201.

In considering whether the defendant has overcome waiver when they did not object, we "'focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured.'" *Id.* (quoting *Emery*, 174 Wn.2d at 762). If the defendant fails to show that any improper remarks were incurable, their claim "'necessarily fails, and our analysis need go no further.'" *Id.* (quoting *Emery*, 174 Wn.2d at 762).

McAlpine argues that the prosecutor committed reversible misconduct during closing arguments in three ways:  by (1) repeatedly telling the jury that ten-year-olds do not make up sexual assaults, (2) offering an opinion on McAlpine's guilt, and (3) repeatedly denigrating defense counsel and their argument through referring to defense's theory as "ridiculous."  Br. of Appellant at 18.

We must first determine which test applies to each of McAlpine's claims.  McAlpine did not object to any of the challenged statements when they occurred in closing arguments. However, after the prosecutor's rebuttal closing arguments, McAlpine requested that the trial court dismiss the case due to the prosecutor's use of "ridiculous" during rebuttal.  This motion to dismiss based on alleged prosecutorial misconduct through the prosecutor's "ridiculous" comments in rebuttal sufficiently preserved a challenge to those statements for appellate review. *See State v. Lindsay*, 180 Wn.2d 423, 430-31, 441, 326 P.3d 125 (2014) (holding that a motion for a mistrial based on prosecutor's closing argument and directly following prosecutor's rebuttal closing arguments preserved for appellate review a prosecutorial misconduct claim).

Because McAlpine preserved for appellate review a challenge to the prosecutor's use of "ridiculous," we review those comments to determine whether McAlpine has shown that (1) the remarks were improper and (2) whether there is a substantial likelihood the misconduct affected the verdict. *Gouley*, 19 Wn. App. 2d at 200. We review McAlpine's other challenges where there was no objection raised below to the prosecutor's conduct to determine whether McAlpine has shown that (1) the prosecutor's comments were improper, (2) the prosecutor's comments were both flagrant and ill-intentioned, (3) the effect of the improper comments could not have been obviated by a curative instruction, and (4) there is a substantial likelihood the misconduct affected the verdict. *Id.* at 201. We first address the challenges where there was no objection below before turning to McAlpine's preserved challenge to the prosecutor's "ridiculous" comments.

A.      *The Prosecutor's Arguments Regarding Ten-Year-Olds Not Making Up Facts Were Not Improper*

McAlpine argues that the prosecutor improperly argued facts outside of the record, vouched for a witness's credibility, and misled the jury by repeatedly telling the jury that ten-year-olds do not make up sexual assaults.

In determining whether a defendant's prosecutorial misconduct claim requires reversal of their conviction, we review the prosecutor's statements in the context of the entire case. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). In closing arguments, prosecutors have "wide latitude to argue reasonable inferences from the evidence, including evidence respecting the credibility of witnesses." *Id.* at 448.

But prosecutors must "'seek convictions based only on probative evidence and sound reason'" and must not argue facts not in evidence. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (quoting *State v. Casteneda-Perez*, 61 Wn. App. 354, 363, 810 P.2d 74 (1991)). A prosecutor also must not vouch personally for the veracity of a witness. *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). Although we will not find prejudicial error based on such statements "unless it is clear and unmistakable that counsel is expressing a personal opinion." *State v. Warren,* 165 Wn.2d 17, 30, 195 P.3d 940 (2008).

McAlpine challenges the five instances when the prosecutor indicated that LL had no reason to lie about the incident with McAlpine, especially as a ten-year-old. First, in closing arguments, the prosecutor stated, "I submit to you [LL] has no reasons to lie. At the time of the incident, she was ten years old." 2 RP (Feb. 6, 2024) at 783. Closely after and following a discussion of some of LL's testimony, the prosecutor then stated, "[LL] was ten years old at the time. No ten-year-old, I submit to you, is going to make up those set of facts unless it happened to them." 2 RP (Feb. 6, 2024) at 783-84. Then, in rebuttal, the prosecutor argued "I submit to you, . . . ten-year-olds do not go around thinking about the facts of this case," "[t]en-year-olds, again, do not think of these things, and they do not make up these facts," and "if you look at the totality of everything and that a ten-year-old doesn't make this up, there was, in fact, a mango Popsicle." 2 RP (Feb. 6, 2024) at 814-815, 836-37. McAlpine did not object below to any of these comments.

Considering these statements in the context of the prosecutor's entire argument, including in rebuttal to defense's arguments in closing, the prosecutor did not clearly express a personal belief in LL's credibility or argue beyond reasonable inferences from the evidence presented.

Evidence of LL's age at the time of the incident and her disclosure was admitted in trial. Although McAlpine asserts that no evidence was presented that ten-year-olds in general do not make sexual assault allegations, McAlpine provides no authority for such a proposition other than citing generally ER 702. ER 702 governs scientific, technical, or other specialized knowledge. When considering the statements in context of the prosecutor's arguments immediately before and after, and in the context of the prosecutor's entire argument, the prosecutor's statements appear to argue for the jury to use their common sense in assessing LL's credibility as connected to evidence presented at trial.

Contrary to McAlpine's assertion that the prosecutor's statements amounted to personally vouching for LL or misleading the jury with unpresented evidence, in context the prosecutor generally stated that the evidence, including LL's age, corroborated LL's testimony and did not indicate that LL had a reason to lie. Because McAlpine fails to show that any of the prosecutor's statements here were improper McAlpine waives any claim based on these statements. *Gouley*, 19 Wn. App. 2d at 201.

B.      *McAlpine Fails to Show That the Prosecutor's Comment About McAlpine's Guilt Was Incurable*

Next, McAlpine argues that the prosecutor improperly commented on McAlpine's guilt in rebuttal after discussing McAlpine's inconsistent statements made during his interview with Detective Muller:

> If you didn't do what Mr. McAlpine did, a reasonable person in that situation would stick to the same response, because they know what happened and they know what didn't happen. But what was Mr. McAlpine doing? He knew he was getting questioned.
> He knew he was getting caught, and so first, he wants to distance himself from [LL] as far as possible, and then when confronted with specific facts, when

17

he realized, oh, gosh, I'm going to get caught on that fact, well, then I need to come up with an explanation. I submit to you only a guilty person would do that in that situation.

2 RP (Feb. 6, 2024) at 833.

To be sure, misconduct occurs when a prosecutor states a personal belief about the guilt or innocence of the accused. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 561, 397 P.3d 90 (2017). "Nonetheless, 'there is a distinction between the individual opinion of the prosecuting attorney, as an independent fact, and an opinion based upon or deduced from the testimony in the case.'" *Id.* (quoting *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006)).

Because McAlpine did not object below to the challenged comment, McAlpine must show that the statement was so ill-intentioned and flagrant that no resulting prejudice could be cured. *Gouley*, 19 Wn. App. 2d at 201. Besides contending that the statement was improper, McAlpine fails to argue or explain how the comment was flagrant or ill-intentioned, especially considering this one comment in context of the prosecutor's entire argument and the fact that the comment was made while discussing evidence submitted at trial. Based on this one comment, even if we assumed the comment was improper, we cannot say a timely objection could not have cured any potential prejudice.

McAlpine argues that the case was close and, given that the prosecutor's comment was made in rebuttal, curing any prejudice would have been difficult. However, McAlpine fails to show how a curative instruction provided to the jury before their deliberation—such as one reminding the jurors that they have been instructed that any statements and arguments by the lawyers are not evidence and that they must disregard any remark, statement, or argument unsupported by the evidence or the law—could not have cured any prejudice if the prosecutor's

statement was improper.[5] *See Emery*, 174 Wn.2d at 766 ("[J]urors are presumed to follow the court's instructions.").

Because McAlpine fails to show that a timely objection and instruction could not have cured any prejudice resulting from the challenged argument, McAlpine has waived this prosecutorial misconduct claim.

C.      *McAlpine Fails to Show That the Prosecutor's Use of "Ridiculous" Amounted to Misconduct*

Lastly, McAlpine argues that the prosecutor committed misconduct by repeatedly using the term "ridiculous" in reference to defense's theories.  Br. of Appellant at 18.  McAlpine argues that these comments denigrated defense counsel and defense's arguments.

A prosecutor "can certainly argue that the evidence does not support the defense theory" so long as they do not "impugn the role or integrity of defense counsel." *Lindsay*, 180 Wn.2d at 431.  Statements that "malign defense counsel" are impermissible as they "can severely damage an accused's opportunity to present his or her case." *Id.* at 432.

In *Lindsay*, the supreme court held that a prosecutor's argument in closing that defense counsel's closing argument was a "crock" impermissibly impugned defense counsel. *Id.* at 433. The supreme court analogized the term with "bogus" and "sleight of hand," two terms a prosecutor in *Thorgerson* used when referring to defense counsel's presentation of that case and

---

[5] McAlpine relies on *State v. Stith*, 71 Wn. App. 14, 22-23, 856 P.2d 415 (1993), to argue that the prosecutor's statements were so prejudicial that even a "'strongly worded curative instructions'" could not have cured them.  Br. of Appellant at 33 (quoting *Stith*, 71 Wn. App. at 23.  However, the circumstances in *Stith* are greatly distinguishable from those here. *See* 71 Wn. App. 14 at 22 (involving comments that clearly reflected the prosecutor's personal opinion as to the defendant's guilt, directly violated a court order to exclude certain evidence, and implied the trial was "a useless formality.").  We are not persuaded by *Stith*.

which the supreme court held impugned defense counsel's integrity. *Id.* at 433. The *Thorgerson* court reasoned that "sleight of hand," in particular, implied that defense counsel was being wrongfully deceptive or dishonest. 172 Wn.2d at 452. The *Lindsay* court similarly concluded the "crock" also implied deception and dishonesty as well as was commonly understood to be a shortened version of "an explicitly vulgar phrase." 180 Wn.2d at 433-34.

Here, while the prosecutor's repeated use of the term "ridiculous" when referring to defense counsel's arguments was inartful, the term does not imply deception or dishonesty as the terms at issue in *Lindsay* and *Thorgerson* do. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1953 (2002) (defining "ridiculous" as synonymous with "laughable"). Viewed in the context of the prosecutor's arguments, the use of the term "ridiculous" appears more to indicate an argument that the evidence failed to support defense's arguments as opposed to an ad hominem attack of defense counsel and their arguments. Accordingly, McAlpine fails to show that these comments amounted to misconduct.[6]

## II. POAA SENTENCE

McAlpine assigns three errors to his sentence of life without the possibility of parole. First, McAlpine argues that the trial court violated his state and federal constitutional right to a jury trial by finding that McAlpine's out-of-state conviction was factually comparable to a Washington offense. Second, McAlpine argues that the trial court violated his constitutional rights to a jury trial by determining that his out-of-state conviction qualified as a strike under the

---

[6] In his prosecutorial misconduct claim for all the challenged statements, McAlpine argues that, even if the instances do not warrant reversal on their own, the combined effect of the misconduct deprived McAlpine of a fair trial. This argument presumes that multiple instances of improper conduct occurred. However, as discussed above, McAlpine fails to show any prosecutorial misconduct. Therefore, McAlpine's cumulative error argument also fails.

POAA.  For his third claim, McAlpine argues that the trial court erred in determining that his Oregon conviction for first degree sodomy was factually comparable to first degree child rape in Washington.  We disagree with all three of McAlpine's claims.

A.       *McAlpine Fails to Show That the Trial Court Violated His Constitutional Rights to a Jury Trial In its POAA Sentence Analysis*

McAlpine argues that the trial court violated his constitutional rights to a jury trial by determining that McAlpine's out-of-state conviction was factually comparable to a Washington offense and concluding that his out-of-state conviction qualified as a strike under the POAA.  We disagree.

In *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), the Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  McAlpine acknowledges that our courts have already held that the sentencing court's POAA analysis, including determining whether a prior out-of-state conviction is factually comparable to a Washington offense, complies with the Supreme Court's holding in *Apprendi* and the line of cases that follow it.  Instead, McAlpine argues that the Supreme Court's more recent decision in *Erlinger v. United States*, 602 U.S. 821, 114 S. Ct. 1840, 219 L. Ed. 2d 451 (2024), has rendered the Washington cases untenable.  We disagree.

Our courts have recently held that *Erlinger* is limited to the "different occasions" inquiry under the federal Armed Career Criminal Act and does not overrule existing Washington precedent.  *State v. Frieday,* 33 Wn. App. 2d 719, 747, 565 P.3d 139 (2025), *cert. denied*, 146 S. Ct. 1609 (2026); *State v. Anderson*, 31 Wn. App. 2d 668, 681, 552 P.3d 803, *review denied*, 3

Wn.3d 1034 (2024). Although McAlpine asks us to not follow those cases and their holding, we decline to do so here. McAlpine's arguments fail.

B.    *The Trial Court Did Not Err in Finding That the Oregon Conviction Was Factually Comparable*

McAlpine argues that the trial court erred in determining that his Oregon conviction for first degree sodomy was factually comparable to first degree child rape in Washington because he asserts that the State failed to carry its burden of proving that he was not married to the Oregon case's victim.

Under the POAA, RCW 9.94A.570, anyone convicted as a persistent offender shall be sentenced to a term of total confinement for life without the possibility of release. The definition of a "persistent offender" includes someone who has twice been convicted of certain listed offenses in Washington or convicted of comparable out-of-state offenses. RCW 9.94A.030(38).[7] Those listed offenses include both first degree child molestation and first degree child rape. RCW 9.94A.030(38)(b)(i), (ii). We review de novo whether an offense can be classified as a strike offense under the POAA. *State v. Thiefault*, 160 Wn.2d 409, 414, 158 P.3d 580 (2007).

For an out-of-state offense to be classified as a prior conviction for purposes of the POAA, that offense must be comparable to a Washington offense listed in RCW 9.94A.030(38). *See State v. Latham*, 183 Wn. App. 390, 397, 335 P.3d 960 (2014). The State bears the burden of providing sufficient evidence to prove that an out-of-state offense is comparable to a Washington offense by a preponderance of the evidence. *Id.* at 398.

---

[7] The legislature has amended RCW 9.94A.030 multiple times since 2019. We cite to the current version of the statute because, for our purposes here, this section had remained substantively the same.

Whether an out-of-state conviction is comparable to a Washington offense involves a legal question and a factual one. *State v. Howard*, 15 Wn. App. 2d 725, 731-32, 476 P.3d 1087 (2020). For the legal prong, "'[i]f the Washington statute defines the offense with elements that are identical to, or broader than, the foreign statute, then the conviction under the foreign statute is necessarily comparable to a Washington offense.'" *Id.* at 731 (quoting *State v. Collins*, 144 Wn. App. 547, 553, 182 P.3d 1016 (2008)). However, if the foreign statute is broader, the State must meet the factual prong and show that the defendant's conduct would have violated the comparable Washington statute. *Id.* at 731-32. The State must show such factual comparability through "'only facts that were admitted, stipulated to, or proved beyond a reasonable doubt.'" *Id.* at 732 (quoting *State v. Olsen*, 180 Wn.2d 468, 473-74, 325 P.3d 187 (2014)).

If an out-of-state conviction involves an offense that is neither legally nor factually comparable to a Washington offense, the sentencing court may not include that conviction in the defendant's offender score or its POAA analysis. *See id.* at 732, 735.

The parties do not dispute that McAlpine's 1997 Oregon conviction for first degree sodomy is not legally comparable to first degree child rape in Washington. Instead, McAlpine argues that the trial court erred in determining that his out-of-state conviction was factually comparable to Washington's first degree child rape because the State did not provide the necessary facts to establish an element of the Washington offense—that he was not married to the victim of his Oregon conviction. We disagree.

At the time McAlpine committed the Oregon offense, Washington's first degree child rape statute required proof that the victim was not married to the defendant. Former RCW 9A.44.073 (1988). Thus, to establish that McAlpine's conduct in the out-of-state conviction

would have constituted first degree child rape in Washington, the State had to provide facts admitted, stipulated to, or found beyond a reasonable doubt that proved by the preponderance of the evidence that McAlpine was not married to the victim of his Oregon conviction. *Howard*, 15 Wn. App. 2d at 732; *Latham*, 183 Wn. App. at 398. The State met its burden here.

While neither the indictment, McAlpine's written plea statement, nor any statement by McAlpine at the hearing to enter the guilty plea mentioned McAlpine not being married to the victim, JM, other documents provided facts that JM was his stepdaughter and not his wife. Here, the State provided such facts through McAlpine's affidavit requesting court-appointed counsel. Through the affidavit, sworn to be true by McAlpine to a notary and under the penalty of perjury, McAlpine named JM, the victim of the Oregon offense, as his stepdaughter and noted that he was married to someone else—LMM.

McAlpine contends that his affidavit is categorically excluded from consideration for factual comparability because it was never subject to a reasonable doubt standard. In support of this proposition, McAlpine cites to *State v. Ortega*, 120 Wn. App. 165, 172, 84 P.3d 935 (2004). In *Ortega*, Division Three of this court held that a sentencing court is prohibited from considering the underlying facts of a prior conviction if those facts were not found by the trier of fact beyond a reasonable doubt. *Id.* at 174. However, in addition to considering only those facts found by the trier of fact beyond a reasonable doubt, a sentencing court may also consider facts "admitted, [or] stipulated to." *Howard*, 15 Wn. App. 2d at 732. Here, the facts contained in McAlpine's affidavit are admitted facts as evident by McAlpine writing and swearing to his statements as true before a notary and under the penalty of perjury.

24

From McAlpine's admission that JM was his stepdaughter and LMM was his wife, the State proved by the preponderance of the evidence that McAlpine was not married to the victim of the Oregon conviction.

Concluding that McAlpine fails to show that the trial court violated his constitutional rights or erred in imposing a sentence under the POAA, we hold that McAlpine's claims regarding his sentence fails.

### III. STATEMENT OF ADDITIONAL GROUNDS

In a SAG, McAlpine argues that the prosecutor committed prosecutorial misconduct and deprived him of a fair trial through certain questions the prosecutor asked of and elicited from prospective juror 42 during voir dire. We hold that McAlpine's SAG claim fails.

Because McAlpine nor his counsel objected to any of the prosecutor's challenged statements during voir dire, McAlpine must show "(1) that comments were improper, (2) that the prosecutor's comments were both flagrant and ill-intentioned, (3) that the effect of the improper comments could not have been obviated by a curative instruction, and (4) a substantial likelihood the misconduct affected the verdict" or else he waives the prosecutorial misconduct claim. *Gouley*, 19 Wn. App. 2d at 201. Critically here, if McAlpine cannot show that any improper remarks were incurable, their claim "'necessarily fails, and our analysis need go no further.'" *Id.* (quoting *Emery*, 174 Wn.2d at 764). Such is the case here.

While the prosecutor's challenged statements occurred before the entire jury pool, the prospective juror was excused after McAlpine used a peremptory challenge. McAlpine asserts that, separate from arguing that a biased or prejudiced juror made it on to the jury, the prosecutor's questioning created a "doubt of innocence" within the minds of other prospective

No. 59511-7-II

jurors. SAG, PDF at 8. However, McAlpine fails to show that, if he had objected to the prosecutor's questioning of prospective juror 42 during voir dire, the trial court could not have cured any alleged potential prejudice by providing curative instruction to the jury pool. Accordingly, McAlpine waived his prosecutorial misconduct claim.

CONCLUSION

We affirm McAlpine's conviction and sentence.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Lee, P.J.

Glasgow, J.

26